FILED
2013 Feb-07  PM 02:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| TONY LEE SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:10-CV-2583-RBP-RRA |
| | ) | |
| GOVERNOR BOB RILEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Tony Lee Smith, is an inmate in the Alabama penal system presently incarcerated at the St. Clair Correctional Facility (SCCF) in Springville, Alabama. He filed this pro se action pursuant to 42 U.S.C. § 1983, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc (RLUIPA). (Amended Complaint Doc. 29) The plaintiff alleges that he has been deprived of rights, privileges, or immunities afforded him under the Constitution or laws of the United States of America and names as defendants, Governor Bob Riley, Commissioner Richard Allen, Associate Commissioners Terrance McDonald and James DeLoach, Grant Culliver, Mr. Baskell, Capt. Kenneth Peters, Sgt. William Northcutt, Officer Greg Bevel, Chaplains Steve Walker, Christopher Summers, Willie Whiting, Anthony Askew, Melvin Jackson, and Jeff Lyles, the Director of Training for the Alabama Department of Corrections, unknown members of CERT who searched his

cell on March 9, 2010, unknown members of the Security Threat Group (STG) Review Committee who determined that the plaintiff is a STG member, Warden Carter Davenport, Warden Joseph Headley, and Capt. Bob Simmons. The plaintiff seeks declaratory and injunctive relief, as well as, compensatory and punitive damages.  In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(2), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136, 111 S. Ct. 1737, 114 L. Ed. 2d 194 (1991).


PROCEDURAL HISTORY

This lawsuit was originally filed in the Middle District of Alabama on May 14, 2010, and transferred to this court on September 23, 2010.   On October 4, 2010, the magistrate judge granted the plaintiff's motion to amend his complaint filed on September 30, 2010.  The plaintiff filed an amended complaint on October 26, 2010. (Doc. 5)  On November 2, 2010, the plaintiff filed a Motion to Dismiss or Correct. (Doc. 7)  On March 22, 2011, the plaintiff again filed a motion to amend his complaint (doc. 13), and on April 1, 2011 filed a motion to supplement pleadings (doc. 17) and a motion to add defendants (doc.19).

On June 8, 2011, the court granted all of the motions and instructed the plaintiff to file an amended complaint and provided the following specific instructions:

> In the amended complaint, plaintiff should name as defendants **only** those persons who violated his constitutional rights.... Plaintiff should also state clearly how each named defendant violated his constitutional rights, the dates on which the incidents occurred, and where the incidents occurred. PLAINTIFF MUST CLEARLY SET FORTH THE **FACTS** CONCERNING ANY INCIDENT ABOUT WHICH HE COMPLAINS. To the extent the plaintiff is complaining about administrative

2

regulations he should include copies of the regulation about which he complains. Plaintiff must also include a copy of any ruling of the Department of Corrections about which he complains. The plaintiff is ADVISED that conclusory and general assertions are not sufficient to state a claim upon which relief under § 1983 can be granted. *See Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984). **The amended complaint must include all of plaintiff's claims in this action; IT SHOULD NOT REFER BACK TO THE ORIGINAL COMPLAINT**. Plaintiff is ADVISED that the Court will consider **only** the claims set forth in the amended complaint and only those defendants against whom the plaintiff makes a specific allegation.

On September 13, 2011, the court entered an Order for Special Report directing that copies of the amended complaint (doc. 29) in this action be forwarded to each of the named defendants and requesting that they file a special report addressing the factual allegations of the plaintiff's complaint.  The defendants were advised that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, would be considered as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  By the same Order, the plaintiff was advised that after he received a copy of the special report submitted by the defendants he should file counter affidavits if he wished to rebut the matters presented by the defendants in the special report.  The plaintiff was further advised that such affidavits should be filed within twenty days after receiving a copy of the defendants' special report.

On December 15, 2011, the defendants filed a special report accompanied by copies of Administrative Regulations 313, 433, 434, and 460, copies of the Religious Activities Review Committee (RARC) Decisions, SOP 222, records of a disciplinary hearing, and the affidavits of Steve Walker, Christopher Summers, Melvin Jackson, Willie Whiting, Anthony

Askew, Gregory Bevel, Kenneth Peters, Jeffrey Lyles, William Northcutt, Terry McDonnell, Richard Allen, James Deloach, Grantt Culliver, Carter Davenport, Joseph Headley, and Eric Bascomb.   On March 20, 2012, Capt. Robert Simmons filed an affidavit.   Thereafter, the plaintiff was notified that he would have twenty days to respond to the motion for summary judgment, filing affidavits or other material if he chose.   The plaintiff was advised of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).   On January 24, 2012, the plaintiff filed a response to defendants' motion for summary judgment. (Doc. 65)  The plaintiff responded to Capt. Simmons' affidavit on March 29, 2012. (Doc. 72).

On July 25, 2012, the magistrate judge entered a report and recommendation in which he recommended that all claims and all defendants except the plaintiff's claims of retaliation against Warden Headley and Chaplain Lyles be dismissed. (Doc. 78). The plaintiff (doc. 81) and the defendants (doc. 82) filed objections.  Because the defendants submitted information which had not been included in their special report, the plaintiff was allowed additional time to respond to the new information.   The plaintiff filed an affidavit addressing the claims of the defendants. (Doc. 84). Based on the new information and the plaintiff's response the report and recommendation was withdrawn on January 10, 2013. (Doc. 86).

## SUMMARY JUDGMENT STANDARD

Because the special reports of the defendants are being considered a motion for

summary judgment, the Court must determine whether the moving party, the defendants, are entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Federal Rule of Civil Procedure 56.*  In making that assessment, the Court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts

immaterial." [citations omitted].  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.


FACTS

Applying the above standard to the facts before the court, the following facts are undisputed or, if disputed, are taken in a light most favorable to the plaintiff.  Tony Lee Smith is currently incarcerated at the St. Clair Correctional Facility (SCCF) where he is serving a 20-year sentence for Assault I and Assault II. (Doc. 51)  The plaintiff is a follower of the Odinist religion which he describes as an ancient pre-Christian religion of Northern Europe and the British Isles. (Doc.29).  He is also an ordained minister and Gothi (Priest), and a student of the Theosophical Society.  *Id*.

In 2003, during an earlier incarceration, the plaintiff filed a Request for Religious Assistance with the Religious Activities Review Committee (RARC) which led to Odinism being officially recognized by the Alabama Department of Corrections (ADOC). See, *Smith v. Haley*, 401 F.Supp. 1240 (2005); *Smith v. Allen*, 520 F.3d 1255 (11th Cir. 2007).  As a result of that request the plaintiff was allowed to worship in a place designated by the warden and chaplain, possess and wear a Thor's hammer necklace, and light a candle in a private and secure place.  The plaintiff's request for a small crystal was denied as the RARC determined there was not enough authoritative evidence to show a need for it. *Id*.

On August 15, 2007, during his current incarceration, the plaintiff submitted another "Inmate Request for Religious Assistance." (Doc. 51, Exh. A).   The plaintiff requested that Odinism be included in AR333 to show that it is officially recognized by the ADOC, a list of approved items be included in the regulations, that he be allowed a cigar box size ritual/sacred items box, a ceremonial mead horn measuring approximately six  and one-half inches, a "bowli" or ritual bowl, a Thor's Hammer necklace, a set of handcrafted rune stones and a small rune bag, a candle for indoor use during inclement weather, a leather study folder, a quartz crystal approximately one and one-half inches, an outdoor worship area with a small fire pit, congregate worship, the recognition of five holy days, and recognition of the Poetic Edda and Prose Edda as the sacred texts of the Odinist and a membership card. (Doc. 29, pp 4-6). In support of his requests, the plaintiff attached a copy of the Technical Reference Manual of the Bureau of Prisons which is applicable to federal prison and federal prisoners.   The plaintiff acknowledged that he already had some of the items in his possession, but stated that he wanted to supplement what he had and receive official authorization for use and possession of them. *Id*.

On May 13, 2010, the RARC issued a response. (Doc. 51, Exh. C). The RARC approved the observance of four religious holy days, the High Feast of Ostara, the High Feast of Baldor, the High Feast of Odin, and the High Feast of Yule. The RARC also approved a blot ceremonial bowl made of paper or plastic no larger than 2 ½ x 1 ½ inches, a mead horn made of paper or plastic no larger than 6 ½ inches in length, and a mead substitute consisting

of fruit juice and water purchased from the prison canteen. The RARC denied the plaintiff's request for an altar cloth because no altar has been approved for Odinism. The committee also denied a crystal, a cigar box sized container for Runes, and a leather folder for a journal, because no substantial documentation has been established that it is a religiously required item. *Id.* pp. 2-3. The committee denied the request for fire other than candle fire because a candle had been approved previously. The committee also denied honey for use in the mead substitute because the primary purpose of honey is for fermentation of the fruit juice. As to the plaintiff's request that the Poetic Edda and Prose Edda be recognized as the sacred texts of the Odinist, the RARC declined saying, "Religious literature and assigning "sacredness" to those writings or items of any religion is the practice of that specific religion. The Religious Activities Review Committee of the ADOC only affirms beliefs as those beliefs are authoritatively documented/published by that religion." *Id.*

The plaintiff originally filed this lawsuit on May 14, 2010, in the Middle District of Alabama. On September 23, 2010, the action was transferred to this court. On June 28, 2011, the plaintiff filed an amended complaint (doc. 29) in which he added the additional claims that the defendants violated his constitutional rights under the First and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc (RLUIPA), by requiring him to produce documents to support his requests for recognition of Odinism as an approved religion, denying him religious items that other religious groups are allowed to have, confiscating religious books and art, operating faith-

based dorms, retaliating against him for his religious beliefs and for filing lawsuits, and discriminating against him because of his adherence to a non-Christian religion.  The plaintiff also added the claim that he had been retaliated against by "members of the A.D.O.C. staff" because he filed this lawsuit.

## FIRST AMENDMENT VIOLATIONS

 "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.   The First Amendment to the Constitution and RLUIPA protect the "free exercise" of religion.

### Free Exercise Clause and RLUIPA

The Supreme Court has described RLUIPA as "the latest of long running congressional efforts to accord religious exercise heightened protection from government-imposed burdens." *Cutter v. Wilkenson*, 544 U.S. 709, 714 (2005).  "Under 42 U.S.C. § 2000cc-1(a) inmates are afforded heightened protection from government-imposed burdens." *Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005).

In his 2007 Request for Religious Assistance, the plaintiff asked for a variety of items which he maintained are central to his practice of Odinism. The RARC researched, evaluated, and discussed the plaintiff's requests pursuant to the guidelines in Administrative Regulation 313. A final response was issued on May 13, 2010. (Doc. 51, Exh. A).  The RARC granted some of the plaintiff's requests, but disallowed his request to possess a cigar

size ritual/sacred item box, leather folder, crystal, fire pit and an altar cloth.  The RARC explained that the crystal, cigar box, leather folder, were denied because substantial documentation had not been established that they are religiously required items. (Doc. 51 Exh. C).

The plaintiff alleges that the defendants are requiring him to produce documents to verify that the exercise of religion is required or a central tenant of his religion. (Doc. 29, p. 2). The plaintiff maintains that his practice of Odinism is substantially burdened by this heightened standard of proof which is not required by RLUIPA and creates a substantial burden on the practice of religion in the ADOC. (*Id*.)

Chaplain Stephen Owen Walker responded to the plaintiff's allegations and explained the decision of the Religious Activities Review Committee. (Doc. 51, Exh. A). Walker explained that Administrative Regulation 313(III)(B)(2) states that it is the inmate's responsibility to provide authoritative sources of information by which the committee can verify the requested practices and beliefs.  *Id*. Chaplain Walker adds that this is not done to burden the inmate but to simply provide the committee a starting point for their research. *Id*. There is no requirement that the plaintiff produce the text or document, just name it as a source of information so the request can be properly evaluated. *Id*.  If the inmate is unable to provide a source, the request becomes difficult to evaluate, but it is not automatically denied.  If the inmate does not provide the source for his request, the RARC does their own research and makes their decision based on their own research. *Id*.  If the RARC must

perform their own research it may take them longer to reach a decision. *Id*.

Chaplain Walker then addressed the decision of the committee regarding the various requested items that were denied. The fire pit was denied because a candle had previously been approved to accommodate the plaintiff's need for a ceremonial fire, and the cigar sized sacred items box was denied because it was not found to be religiously necessary for the storage of other approved items. (Doc. 51, Exh. A, p.2).  Books and study materials had been approved previously and the RARC does not create a list of specific books and study materials and does not determine the sacredness of a particular text. *Id*.

The plaintiff's request for the Feast of Walburg to be recognized as a holy day was denied because the RARC determined it did not have the same significance as the other four holy days which were approved. *Id*.  The provision of food by a free world sponsor was not discussed by the RARC because a request for pork items to be made available had previously been approved and no proper request had been made for additional food to be provided by either the ADOC or free world sponsors. *Id*.

The plaintiff's request for official membership cards was not addressed because membership cards are used by the ADOC as an administrative tool when necessary to determine which inmates are authorized to be in a certain religious area.  Membership cards are not items which the RARC manages. *Id*.

As to the plaintiff's request for official recognition of Odinism in the Administrative Regulations, Chaplain Walker states that the Administrative Regulations Administrative

Memorandums that govern Religious Programs and operations of the RARC clearly indicate that once a decision has been made regarding a religious practice, then that decision becomes policy and an amendment to the regulation. (Doc. 51 Exh. A).

In response to the special report of the defendants, the plaintiff ignores the statement of Chaplain Walker that he did not have to produce documents published by his religion in support of his request for religious assistance, he merely needs to provide a reference to the materials that will support his request and provide a starting point for the committee's research. The plaintiff continues to claim that his constitutional rights have been violated by this requirement and claims that such a requirement cannot be reconciled with RLUIPA.

In a cause of action under RLUIPA, the initial burden is on the plaintiff to demonstrate that the government practice complained of imposes a substantial burden on his religious exercise by showing: (1) that the burdened activity is a religious exercise; and (2) that the religious exercise was substantially burdened. Religious Land Use and Institutionalized Persons Act of 2000, § 2 *et seq.*, 42 U.S.C.A. § 2000cc *et seq.*[1] *Sossamon*

---

[1]      42 U.S.C.A. § 2000cc-1
Title 42. The Public Health and Welfare
   Chapter 21C. Protection of Religious Exercise in Land Use and by Institutionalized Persons
    § 2000cc-1. Protection of religious exercise of institutionalized persons

(a) General rule
No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--

     (1) is in furtherance of a compelling governmental interest; and

     (2) is the least restrictive means of furthering that compelling governmental interest.

*v. Lone Star State of Texas*, 560 F.3d 316 (5th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255 (11th Cir. 2007). If the plaintiff succeeds in demonstrating a *prima facie* case, the government must then demonstrate that the challenged government action "is in furtherance of a compelling governmental interest" and is the least restrictive means of furthering that compelling government interest. 42 U.S.C. § 2000cc-1(a), 2000cc-2(b). If the plaintiff fails to put forth a *prima facie* case the court need not inquire further. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004).

## Substantial Burden

The Eleventh Circuit has held that an individual's exercise of religion is "substantially burdened" if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004) (*citing, Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir.1995)(applying the Religious Freedom Restoration Act, we found no substantial burden when religion did not require particular means of expressing religious view and alternative means of religious expression were

---

(b) Scope of application

    This section applies in any case in which--

        (1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or

        (2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

available); *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1550 (11th Cir.1993)(finding a substantial burden when regulation had the effect of mandating religious conduct).

      The Eighth Circuit has said that substantially burdening one's free exercise of religion means that the regulation,

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008) (quoting *Murphy v. Mo. Dep't of Correctional Facility*. 372 F.3d 979, 988 (8th Cir. 2004)).

      In *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760–61 (7th Cir.2003),the Seventh Circuit said that "in the context of RLUIPA's broad definition of religious exercise, a . . . regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." In *Koger v. Bryan*, 523 F.3d 789 (7th Cir.2008), the Seventh Circuit, quoting language from the Supreme Court's decision in *Thomas v. Review Bd.*, 450 U.S. 707 (1981), to explain the substantial burden test, noted that Thomas teaches that government conduct is substantially burdensome "when it 'put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs.'" *Koger*, 523 F.3d at 799 (*quoting Thomas*, 450 U.S. at 718).

In response to the decision of the RARC the plaintiff does not point to religious authorities for support of his requests and has not put forth any facts to show that being asked to provide authoritative sources of information by which the committee can verify requested practices and beliefs substantially burdened his religious exercise, which is the practice of Odinism.  Instead, the plaintiff  argues that "there is evidence before the Court that establishes it is his sincerely held belief that these items are necessary," and cites the court to his attached affidavit.  The essence of the plaintiff's affidavit is that other similar nature based religions are allowed to have those items or other individuals have been allowed to have them.  For some items the plaintiff explains how they are to be used in the performance of various rituals, but again does not point the committee or the court to the source of his authority or show how the denial of the items has substantially burdened his practice of Odinism.

The plaintiff has clearly shown that he is engaged in a religious exercise and for purposes of summary judgment it is undisputed that he is sincere in his religious beliefs. However, the plaintiff has failed to show how producing the titles of source information to help the RARC make a decision about his requested items substantially burdens his religious exercise.  The plaintiff has failed to put forth a *prima facie* case and the defendants are entitled to summary judgment on the plaintiff's claim that being required to identify source information about his religion violates the First Amendment and RLUIPA.

## Establishment Clause

*Honor Dorms*

The plaintiff was housed in the honor dorm on two occasions. (Doc. 51 Exh. J).  The first time was from December 8, 2006 to July 16, 2007.  He was removed from the honor dorm for assaulting another inmate. *Id.*  The plaintiff was housed in the honor dorm a second time from July 5, 2009, to July 13, 2010.  The plaintiff was removed from the dorm the second time when he failed a drug test. The plaintiff alleges that the ADOC is operating faith based/honor dorms in violation of the Establishment Clause of the Constitution.  The plaintiff claims that inmates who live in the faith based/honor dorms are allowed family night visitation, access to audio visual equipment, musical instruments, favorable classification, and parole consideration.  The plaintiff alleges that the very operation of these dorms by the ADOC violates the Constitution.  According to the plaintiff, a requirement for participation in these dorms is mandatory attendance in religiously themed classes. (Doc. 29, p. 8)  The plaintiff claims that during the time he lived in an honor dorm he was forced to attend a Buddhist meditation class in order to participate in family night and receive the other benefits of living in the honor dorm. *Id.*

In order to demonstrate a violation of the Establishment Clause, Smith must show one or more of the following: that the honor/faith dorms have a non-secular legislative purpose, that their primary effect is to advance or inhibit religion, or that the honor dorms foster "an excessive government entanglement with religion." See *Lemon v. Kurtzman*, 403 U.S. 602,

91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

The defendants submitted a copy of Standard Operational Procedure 222 - Faith Based Honor Dorm (doc. 51 Exh. N) which sets out the policy and procedures for the dorm.  The purpose, as stated in the SOP,

> . . . is to create a community providing a safe, secure, and healthy environment in which residents can receive encouragement not only to face their problems but to find the support needed to solve them once and for all by means of a program based on spiritual principles and concepts. The Faith Based Honor Dorm should be an environment where criminal activity is viewed as abnormal and unacceptable, a place where residents take pride in being law abiding citizens.  This program helps residents (physically, mentally, and spiritually) get out of prison and <u>stay out</u>.  It also teaches life skills, job skills, and communication skills.  The Faith Based Honor Dorm provides a new approach to "prison programs" marked by dedication, discipline, opportunity, ownership, and integrity.

Inmates who want to be in the FBHD must complete an application, have a one year clear record and agree to work towards a GED or high school diploma.  Inmates are then placed on a waiting list and interviewed prior to being moved to the FBHD.  Former Chaplain Jeffrey Lyles, now retired, was responsible for the administration of the Faith/Character Based Honor Dorm while employed at SCCF. (Doc. 51, Exh. J).  Chaplain Lyles states by affidavit that there is no requirement for an inmate to enroll in a religious based class in order to remain in the dorm.  During this first time in the dorm the plaintiff chose to enroll in a Meditation Class.  *Id*.  During the second time the plaintiff was enrolled in Houses of Healing Class and Self-Awareness Class, both of these programs are non-religious, self-help classes.  *Id*.  Terrance McDonnell, Corrections Associate Commissioner,

states that the Faith/Character Based Honor Dorms are nondenominational, non-sectarian, non-forced, and non-coercive housing units designed to encourage personal growth in an institutional setting. (Doc. 51, McDonnell affidavit).

A review of SOP 222 and Administrative Regulation 460 - Faith/Character Based Programs, shows clearly that the purpose of FBHD is to help reshape the character and focus of the inmates housed there through a variety of opportunities to learn life skills.  While religious education may be among the study opportunities for inmates in the FBHD, the overall goal of the dorm is of a secular nature.  The plaintiff has failed to show that the ADOC is attempting to foster or advance religion through the Faith Based Honor Dorms.  This claim is due to be dismissed.

*Reading Materials in Segregation*

The plaintiff alleges he was prevented from having any religious text except a Bible while he was in punitive segregation. (Doc. 29, p. 29).  The plaintiff complains that AR 434 violates the First and Fourteenth Amendments.

Warden McDonnell responded to the plaintiff's allegations by stating,

The items available to an inmate housed in segregation are governed by Regulation 433-Administrative Segregation, and Regulation 434-Disciplinary Segregation.  Each regulation allows an inmate to have one religious book, one Alcoholics/Narcotics Anonymous book, and one educational book while in segregation.  The language of AR 434 refers to the religious book as a "Bible" whereas AR 433 refers to that item as a "religious book of their preference."  AR 433 was rewritten in 2009 to include this more general language.  AR 434 was written in 2004.  When AR 434 is updated in the near future, it will include the language of 433.  To the best of my knowledge, in practice, inmates housed in Disciplinary Segregation are given the choice of their own

religious text, and not forced to read a Bible.

(Doc. 51, Exh. O, p. 2).

The plaintiff is complaining generally about a DOC regulation, but he does not allege that he requested any religious materials from any of the defendants he has named in this lawsuit and his request was denied.  The plaintiff does not allege that he has suffered any injury as a result of the wording of AR 433 or 434.  This claim is due to be dismissed.

## CONFISCATION OF PERSONAL PROPERTY

The plaintiff alleges that on March 9, 2010, the Correctional Emergency Response Team (CERT) team and Warden Culliver entered his cell, ordered him to strip and come out of his cell, then placed him against the wall with his hands behind his head. (Doc. 29, p. 9). The plaintiff's cell was then searched and numerous items of personal property, most of which had been used or created in a continuing education art class the plaintiff had taken several years earlier, and items used in his observance of Odinism were confiscated. Additionally, the CERT team damaged or disposed of the plaintiff's art supplies.  Warden Culliver questioned the plaintiff about the artwork and told him it is "STG (Security Threat Group) in prison."  The plaintiff complains that he was not given a property sheet for the items taken, had them returned, or been compensated for them.

### Violation of Administrative Regulation

To the extent the plaintiff is complaining that the defendants failed to follow a routine

procedure when they failed to give him a property sheet, he fails to state a constitutional claim. The mere fact that agency regulations or procedures have been violated does not by itself raise a constitutional issue. *United States v. Caceres*, 440 U.S. 741 (1979). The regulation must have been mandated by the Constitution or a statute in order for it to be enforceable by this court.  The ADOC is not required by law or the Constitution to adopt a particular procedure for acknowledging the confiscation of property from an inmate's cell. The Administrative Regulations of the ADOC are promulgated for internal guidance.  The plaintiff does not allege that he has suffered a violation of any of his constitutional rights by the failure of the defendants to give him a property sheet. Thus, the plaintiff's claim that defendants violated prison regulations or procedures by failing to give him a property sheet for items removed from his cell is due to be dismissed for failing to state a claim under § 1983.

### Violation of Due Process

As to the plaintiff's claim that he has not been compensated for lost or damaged property, he again fails to state a claim of constitutional proportion.  In *Parratt v. Taylor*, 451 U.S. 527 (1981), the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently destroys the personal property of an individual, unless the State fails to provide an adequate postdeprivation remedy. Section 41-9-60 of the Code of Alabama provides for the State Board of Adjustment to consider claims against the state or its agents.  As such, the plaintiff

cannot state a claim of constitutional proportion based merely on the allegation that the defendants wrongfully or negligently took or damaged his personal property. If the defendants were agents of the State of Alabama, plaintiff has a remedy under the state statute. Should the Board of Adjustment deny the claim, as the plaintiff here alleges, the plaintiff may then bring an action in the courts of the state of Alabama for redress. *See Carmichael v. State Board of Adjustment*, 249 Ala. 542, 32 So.2d 216 (1947).

Three years after *Parratt*, the Supreme Court, in *Hudson v. Palmer*, 468 U.S. 517, 533 (1984), again looked at the issue of whether or not an inmate has a reasonable expectation of privacy in his prison cell thereby entitling him to Fourth Amendment protection against unreasonable search and seizure. *Id*., p. 519. After holding that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell," *id*. p. 526, the Court went on to address the issue of the intentional destruction of an inmate's personal property by state employees acting under color of state law. The *Hudson* Court reasoned that if a negligent deprivation of property does not violate the Due Process Clause, then it follows that intentional deprivations do not violate that clause either. *Id*. p. 533).[2] Therefore, the alleged deprivation of the plaintiff's personal property does not rise to a constitutional level, and his remedy, if any, is pursuant to state law.

The plaintiff had a number of items in his cell which had never been approved, but

---

[2]     Two years after reaffirming *Parratt*, the Supreme Court in companion cases of *Daniels v. Williams*, 474 U.S. 327 (1986) and *Davidson v. Cannon*, 474 U.S. 344 (1986), partially overruled *Parratt* on other grounds.

had been in his possession for a significant period of time.  To the extent the plaintiff is

arguing that the search was unwarranted and he had a right to keep particular property

because it had been in his possession for a number of years or it is available in the prison

library, or it is representative of his religious beliefs, his claim is without merit.  In *Hudson*

*v. Palmer,* 468 U.S. 517 (1984), the Supreme Court held that "prisoners have no legitimate

expectation of privacy and that the Fourth Amendment's prohibition of unreasonable searches

does not apply in prison cells." *Id.*, p. 530.

> The Court observed:
>
> Within th[e] volatile "community" [of a prison], prison administrators are to
> take all necessary steps to ensure the safety of not only the prison staffs and
> administrative personnel, but also visitors.  They are under an obligation to
> take reasonable measures to guarantee the safety of the inmates themselves.
> They must be ever alert to attempts to introduce drugs and other contraband
> into the premises which, we can judicially notice, is one of the most perplexing
> problems of prisons today; they must prevent, so far as possible, the flow of
> illicit weapons into the prison; they must be vigilant to detect escape plots, in
> which drugs or weapons may be involved, before the schemes materialize.  In
> addition to these monumental tasks, it is incumbent upon these officials at the
> same time to maintain as sanitary an environment for the inmates as feasible,
> given the difficulties of the circumstances.
>
>         . . . [I]t would be literally impossible to accomplish the prison
> objectives identified above if inmates retained a right of privacy in their cells.
> Virtually the only place inmates can conceal weapons, drugs, and other
> contraband is in their cells.  Unfettered access to these cells by prison officials,
> thus, is imperative if drugs and contraband are to be ferreted out and sanitary
> surroundings are to be maintained.

*Id.* at 526-27.

> The plaintiff's claim that the defendants violated his constitutional rights when they

searched his cell, took items that had been in his possession for a period of time, and labeled some of those items as STG, fails to state a constitutional claim and is due to be dismissed.

## EQUAL PROTECTION

### *Religious Items*

The plaintiff complains that he is being denied equal protection because Native American inmates are allowed to have fire pits and he is only allowed to have a candle, he has been denied a sacred item box to store his personal ritual items, which both Wiccans and Native American inmates are allowed to have, and has not been allowed to have a musical instrument in his cell which Christian inmates or residents of the FBHD are allowed to have. He also complains that the prison allows KAIROS,  a group of Christian volunteers, to bring food into the prison for invited prisoners, but Odinists are prohibited from having food associated with their feast days.  Odinists are allowed to observe the four feast days, but are not allowed food provided by an Odinist congregation.  The plaintiff also complains that ADOC does not use state funds to buy religious books other than bibles.

"To prove an equal protection claim, [a prisoner] must show treatment that was invidiously dissimilar from that accorded other inmates, with no rational basis existing for the difference in treatment." *Flittie v. Solem*, 827 F.2d 276, 281 (8th Cir. 1987). *See also Clark v. Groose*, 36 F.3d 770, 772 (8th Cir. 1994).  However, the Equal Protection Clause has long been limited to instances of purposeful or intentional discrimination rather than

erroneous or even arbitrary administration of authority.  *See Snowden v. Hughes*, 321 U.S. 1, 8 (1944).  "Absent any allegation of a discriminatory purpose, a mere failure of those who administer the law to treat equally all persons who violate the law does not constitute a denial of the constitutional right to equal protection."  *Harrington v. United States*, 673 F.2d 7, 11 (1st Cir. 1982) (citations omitted).  *See also E & T Realty v. Strickland*, 830 F.2d 1107 (11th Cir. 1987).  Regardless of what other religious groups are allowed to have, the plaintiff's request for a fire pit was denied "because a candle had been previously approved to accommodate the need for ceremonial fire." (Doc. 51, Exh. A, p.2)  The request for a sacred items box was "not found to be religiously necessary to house other approved items." *Id*.  The plaintiff's claim that he is not allowed to have a guitar because he is not a Christian is unsupported by any facts.  Likewise, the plaintiff's allegation that the ADOC does not utilize funds to assist pagan religions, is unsupported by facts. Chaplain Walker responded to the plaintiff's allegations regarding the denial of free world food by stating, "The RARC had previously approved a request for pork items be made available for Odinist religious purposes, and no proper request was made for additional food items, whether they be provided by ADOC or free world sponsors." (Doc. 51, Exh. A pp. 2-3). The plaintiff has failed to show dissimilar treatment on the part of the defendants.  Inmates seeking items for use in their religious exercises must submit a written request to the RARC.  The committee reviews the information provided with the request and issues a memorandum based on their research.  The decisions of the RARC are all different because the requests are different and

the religions are different.  The plaintiff has not submitted any facts to show any dissimilar treatment of inmates submitting requests to the RARC.  This claim is therefore due to be dismissed.

### ***Confiscated Books***

On August 13, 2010, defendant Peters and Bevel confiscated books from the plaintiff's locker.  The books that were confiscated were, *Triumph of Reason: A Thinking Man's Guide to Adolph Hitler, Introduction to Viking Mythology, The Religion of the Aryan-Germanic Folk: Exoteric and Esoteric*, and *Mein Kampf*.  The plaintiff maintains that these books are vital for a full understanding of his sincerely held religious, political, and cultural beliefs.

Both officers submitted affidavits in response to the plaintiff's allegations in which they state that conducted a routine search of the plaintiff's cell on August 10, 2010. (Doc. 51, Exh. H and I). Capt. Peters stated that

> the plaintiff had STG symbols drawn on the items in his possession to include Swastikas, German SS lightning bolts, and German Cross designs.  The items were not authorized under Regulation #313-Chaplain Services and Religious Activities, or Regulation # 333- Religious Programs Services, and were contraband.  The items were confiscated pending verification from Chaplin [sic] Jeff Lyles through the State Religious Activates [sic] Review Committee (R.A.R.C.) that the items were authorized.  Chaplin [sic] Lyles reported that the R.A.R.C. had already reviewed Inmate Smith's claims on May 13, 2010 for the items and the R.A.R.C. had determined the items to be unauthorized for use with the Odinist Religion. Chaplin [sic] Lyles advised me that the R.A.R.C. and Chaplin [sic] Lyles had already advised Inmate Smith, and forwarded me a copy of the R.A.R.C. findings.  It was determined by these findings, that Inmate Smith was aware on August 10, 2010, that the items were not authorized, and were contraband, and he maintained them in his possession

anyway; as a result the items were confiscated/disposed of as contraband and
Inmate Smith received disciplinary action.

(Doc. 51, Exh I, pp 1-2).

To the extent the plaintiff is claiming that the books were of a religious nature and the
defendants violated his constitutional rights when they confiscated them, the Supreme Court
has said, "[W]e do not read RLUIPA to elevate accommodation of religious observances
over an institutions need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709
(2005).  The plaintiff's allegation that the confiscation of books with Swastikas drawn in
them violated his constitutional rights is due to be dismissed.


## DISCIPLINARY PROCEEDINGS

Based on the books and drawings confiscated from the plaintiff's cell, Officer Bevel
wrote the plaintiff a disciplinary for possession of contraband.  The plaintiff complains that
he was denied witnesses and not allowed to present any documentary evidence at the
disciplinary proceedings.  The plaintiff was found guilty and sentenced to twenty days in
punitive segregation and twenty days of restrictions. (Doc. 29, pp 19-20). The plaintiff was
not allowed to participate in religious services or allowed religious items while in
segregation.

Prior to the United States Supreme Court's decision in *Sandin v. Conner*, 515 U.S.
472 (1995), the court had held that state law could create a liberty interest, protected by the
due process clause, in remaining in the general prison population.  *Hewitt v. Helms*, 459 U.S.

460, 470-71 (1982).  The *Sandin* case has now changed the landscape in the analysis of this type of case.  Dealing with a case in which a prisoner in Hawaii sued prison officials under § 1983 alleging that he had been denied due process of law before being confined to disciplinary segregation for 30 days, the court concluded that segregation as a form of punishment was not a "dramatic departure" from the ordinary conditions of incarceration.  As such, segregation did not amount to a grievous loss of a "substantive" interest protected by the Due Process Clause.  Unlike the loss of good-time credits at issue in *Wolff v. McDonnell*, 418 U.S. 539 (1974), mere disciplinary segregation is the type of punishment an incarcerated individual should expect, and one that ordinarily is not a major change in his living conditions.  In concluding that placement in disciplinary segregation does not implicate due process, the Court held:

> We hold, therefore, that neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded Conner a protected liberty interest that would entitle him to the procedural protections set forth in Wolff. The regime to which he was subjected as a result of the misconduct hearing was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life.

*Id.* at 487.

After *Sandin*, no longer does the prospect of disciplinary segregation alone mandate the due-process procedures defined in *Wolff*.  Placement in a one-man cell is not dissimilar to other forms of confinement found in the Alabama prison system, including administrative segregation, protective custody, and the frequent lockdowns of general population that occur.  As such, disciplinary segregation is not a "dramatic departure" from the ordinary conditions

27

of confinement nor is it a "major disruption in [prisoners'] environment." Thus, under the authority of *Sandin v. Conner*, prisoners sentenced to disciplinary segregation have no protected interest requiring the due-process protections outlined in *Wolff v. McDonnell*. Because there is no right to procedural due process of law before the imposition of disciplinary segregation, neither the lack of due process nor any deficiency in procedure actually used is actionable under the Fourteenth Amendment or § 1983.

Plaintiff claims that he was written an illegal disciplinary report, not allowed to have witness testimony or to submit documentary evidence. Because plaintiff did not have a protectible interest in remaining in population, and not being transferred to disciplinary segregation, his right to due process was not violated. Therefore, plaintiff's claim based on the Fourteenth Amendment is due to be dismissed.

## CLASSIFICATION

The plaintiff alleges that unknown officials of the ADOC have labeled him a Security Threat Group member and that he is listed in the state computer as a member of the Southern Brotherhood. The plaintiff denies being a member of this group and asks the court to order the ADOC to correct their records accordingly. The plaintiff alleges that this false classification "can be used to prohibit participation in programs, both religious and secular, and may be used for classification and parole considerations, as well as any future sentencing decisions."

Investigator/STG state Coordinator Eric Bascomb submitted an affidavit (doc. 51 Bascomb affidavit) in which he states that the plaintiff is currently classified as "Suspected Southern Brotherhood." The defendant denies being responsible for the classification or the labeling of any of the plaintiff's property. (*Id.*)

The plaintiff has failed to state a constitutional claim cognizable under 42 U.S.C. § 1983. An inmate may claim the protection of the due process clause only if the state deprives him of a property or liberty interest that is a legal entitlement under state or federal law. *Meachum v. Fano*, 427 U.S. 215 (1976). In *Jones v. Diamond*, 594 F.2d 997 (5th Cir. 1979), the Court of Appeals stated:

> In *Moody v. Daggett*, 429 U.S. 78, 97 S. Ct. 274, 50 L. Ed.2d 236 (1976), the Supreme Court said that prison classification is a matter delegated by Congress to the discretion of federal prison officials, and thus implicates "no legitimated statutory or constitutional entitlement sufficient to invoke due process," 429 U.S. at 88 n.9, 97 S.Ct. at 279. In the state prison context, convicts have no due process right to any classification system beyond that mandated by state law. We have often emphasized that classification is a matter relegated to the discretion of prison officials.

594 F.2d at 1015. The United States Supreme Court held in *Hewitt v. Helms*, 459 U.S. 460, 468 (1983),

> [A]s long as the condition or degree of confinement to which the prisoner is subject is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.

459 U.S. at 467-68.

"Inmates have neither a protectible property nor liberty interest in custodial

classification." *Mikeska v. Collins,* 900 F.2d 833, 836 (5th Cir. 1990).  The plaintiff does not claim that he has suffered any adverse consequence as a result of his classification.  Since plaintiff has no right to a particular classification, the fact that the plaintiff is classified as "Suspected Southern Brotherhood" has not deprived him of his constitutional rights.  The plaintiff does not claim that he has been prohibited from participating in any programs or had the false labeling used against him in a parole consideration. Therefore, to the extent plaintiff is complaining that the defendants have violated his constitutional rights by this classification, his complaint is due to be dismissed.

## RETALIATION

The plaintiff complains that he and members of the Odinist faith have been selectively targeted by the DOC staff on the basis of their religion and that he as been subjected to retaliation for filing this civil lawsuit. (Doc. 29, p. 16)  In his amended complaint, the plaintiff alleged that the: 1) urinalysis that was ordered when he lived in the FBHD; 2) search of his cell at 1:00 a.m by Officer Bevel on an unspecified date; 3) confiscation of items that had been in his possession for years; 4) photographing of sacred items by Officer Bevel on August 10, 2010; 5) confiscation of items from the Odinist storage box by Officer Bevel on August 13, 2010; 6) the disciplinary he was given for the possession of contraband written by Officer Bevel on August 19, 2010; 7) placement in punitive segregation on August 31, 2010; 8) confiscation of history books from the congregate religious box on September 20,

2010; 9) denial of permission, submitted on December 1, 2010, to observe the High Feast of Yule on December 21, 2010; 10) transfer to a higher security level prison when he filed a request to celebrate the High Feast of Ostara on March 3, 2011; and 11) being subjected to a non-random urinalysis on March 16, 2011, when he was returned to St. Clair Correctional Facility, were acts of retaliation for the plaintiff filing this lawsuit. (Doc. 29, pp. 16-22).

The Eleventh Circuit has held that prison officials cannot take adverse action against an inmate in retaliation for the inmate filing lawsuits and administrative grievances. *Wildberger v. Bracknell,* 869 F.2d 1467 (11th Cir. 1989). "Even claims which might not rise to the level of constitutional deprivations under § 1983 may yet be cognizable by the courts where the prisoner has sufficiently alleged facts establishing that the actions taken against him were taken in retaliation for filing lawsuits and administrative grievances." *Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986). However, it has been recognized that claims of retaliation are subject to abuse by prisoners. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). In order to maintain a valid retaliation claim, the plaintiff must prove (1) that his speech or act was constitutionally protected, (2) that the defendant's retaliatory conduct adversely affected the protected speech,[3] and (3) that there is a causal connection between the retaliatory action and the adverse affect on speech.[4] *Moton v. Cowart*, 631 F.3d 1337,

---

[3]        The Eleventh Circuit explained this element, in an earlier Smith case,  as requiring a plaintiff to show that the discipline he received "would likely deter a [prisoner] of ordinary firmness" from engaging in the protected speech. *Smith v. Mosely*, 532 F.3d 1270, 1277 (11th Cir. 2008).  This is an objective inquiry. *Id.*

[4]        The plaintiff must present facts which show that his exercise of a constitutionally protected right was a "motivating factor" behind a defendants' actions against him. *Mount Healthy City*

1341 (11th Cir. 2011).

In *Adams v. Mosley*, 2008 WL 4369246 (M.D. Ala. Sept. 25, 2008), Magistrate Judge

Charles S. Coody explained the procedure for an inmate to prove that the defendants' actions

were retaliatory:

> An inmate has the initial burden of establishing a prima facie case of unlawful
> retaliation by a preponderance of the evidence, which once established raises
> a presumption that the prison official retaliated against the inmate. *Texas
> Dep't. of Cmty Affairs v. Burdine*, 450 U.S. 248 (1981). To establish a prima
> facie case, an inmate must show that he was engaged in a protected activity,
> such as the filing of a lawsuit; that he suffered an adverse treatment
> simultaneously with or subsequent to such activity; and that there was a causal
> link between the protected activity and the adverse treatment. *Donnellon
> v.Fruehauf Corp.*, 794 F.2d 598, 600-01(11th Cir. 1986). If an inmate
> establishes a prima facie case, the burden then shifts to prison officials to rebut
> the presumption by producing sufficient evidence to raise a genuine issue of
> fact as to whether the prison official retaliated against the inmate. This may be
> done by the prison official articulating a legitimate, non-retaliatory reason for
> the adverse decision or action, which is clear, reasonably specific and worthy
> of credence.
>
> The prison official has a burden of production, not of persuasion, and thus
> does not have to persuade a court that he or she actually was motivated by the
> reason advanced. *Burdine*, supra. Once the prison official satisfies this burden
> of production, the inmate then has the burden of persuading the court that the
> proffered reason for the adverse decision is a pretext for retaliation. An inmate
> may satisfy this burden by persuading the court either directly that a retaliatory
> reason more than likely motivated the prison official or indirectly that the
> proffered reason for the adverse decision is not worthy of belief. By so
> persuading the court, the inmate satisfies his ultimate burden of demonstrating
> by a preponderance of the evidence that he has been the victim of unlawful
> retaliation. *Burdine*, supra.

---

*School District Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  In other words, he must show that the
defendants were "subjectively motivated" to discipline him because of his exercise of a protected right.
*Smith v. Mosley*, supra, at 1278.

The defendants responded by affidavit to the plaintiff's allegation of retaliation for filing this lawsuit. The plaintiff claims that he was removed from the Faith Based Honor Dorm prior to receiving the test results of a urinalysis. In their special report, the defendants explained that the plaintiff was removed from the Honor Dorm because he failed a drug test. The plaintiff did not respond to this proffered explanation.

The plaintiff complained that the defendants retaliated against him by searching his cell and confiscating "his sacred item box, several books, purchased through an approved vendor, pertaining to the historical person of Adolf Hitler, and runes with a rune cloth, wooden ritual bowl, and assorted papers, which had been in his personal possession for four years." (Doc. 29, p.17). The plaintiff alleged that Warden Wise had approved the possession of some of those items and included a request slip from 2008. (Doc. 29). A decision of the RARC in 2010 disallowed the possession of the confiscated items, and this decision was issued after the earlier approval in 2008. (Doc. 51, p.14). The defendants explained that the items were unauthorized items. (Doc. 51, p.14). The plaintiff offered no response to this explanation.

In August of 2010, the plaintiff was written a disciplinary for the possession of contraband and found guilty of the charges. While a prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegations, no claim can be stated when the alleged retaliation arose from discipline imposed for acts that a prisoner was not entitled to perform. *Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir. 1990). The plaintiff

clearly was not entitled to possess contraband.  Because he was found guilty of this infraction, this claim of retaliation must fail.

The plaintiff complains that Lt. Peters and Officer Bevel searched the congregate religious box and confiscated five history books, a candle holder, a wooden Thor's Hammer, and a rune staff. (Doc. 29 p. 21). Lt. Peters explained by affidavit that the items were considered contraband. The plaintiff states in his objections only that the books were confiscated by Peters because of his personal dislike for the plaintiff, not because there were swastikas in them. (Doc. 81, p. 3).  The plaintiff's conclusory allegations of retaliation and the absence of evidence that Officer Peters seized his books due to "his personal dislike not because [of the] swastikas drawn on them" do not establish a retaliation claim. *Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Moody v. Baker*, 857 F.2d 256, 258 (5th Cir.1988).  The plaintiff has failed to establish a prima facie case of unlawful retaliation in any of these instances.

In the initial report and recommendation, the court concluded that the plaintiff had established a prima facia case of retaliation on the part of Warden Headley and Chaplain Lyles.  In objecting to that finding, Warden Headley and Chaplain Lyles stated that they did not know that the plaintiff had filed a lawsuit against them until they received the order from this court on September 13, 2011, to file a special report and respond to the plaintiff's allegations.  The plaintiff was allowed to respond to this proffer and submitted an affidavit

in which he states that he sent an "Inmate Request Slip" to Warden Wise on August 3, 2010.[5]

The plaintiff states that he included, along with the "Inmate Request Slip," a copy of the

initial May 14, 2010 complaint. The plaintiff attached a copy of the request slip to his

affidavit. (Doc. 84, exh. D-5).  On the "Inmate Request Slip," the plaintiff had written,

"Warden Wise, I am again requesting to see you in regards to the enclosed contents and other

matters connected to such." *Id*. Warden Wise forwarded the request slip to Defendant

Warden Headley.  (The date it was received by Headley is not known.)  The plaintiff also

states that he submitted a later "Inmate Request Slip" to Warden Headley on August 23,

2010. He again included  a copy of the original May 14, 2010 complaint. (Doc. 84, exh. J-1)

The plaintiff states that he was then interviewed by Warden Headley on August 25, 2010, in

response to his August 23, 2010 inmate request. In his interview with Warden Headley, the

plaintiff states that he

> expressed a desire to abandon the litigation of this action, at the time still
> pending in the Middle District, and also advising Headley of Peters
> confiscation of my property.  It was apparent to me that Headley didn't want
> to discuss the matter and he was visibly irritated.  I left Headley's office and
> a few days later placed in punitive segregation.

Doc. 84, p. 2. On August 26, Headley responded to the plaintiff's request (forwarded to him

from Wise), "Look over disp & items in detail, Headley CWI, 8/26/2010." *Id*. It is not known

what happened to these "items" thereafter.

The plaintiff has shown that Warden Headley knew of the lawsuit no later than August

---

[5]     Warden Wise was not named as a defendant in this lawsuit.

35

23, 2010, when the plaintiff sent the complaint directly to him. The plaintiff also personally told Headley of the lawsuit two days later, on August 25, 2010. The plaintiff does not report informing any of the other defendants, including Chaplain Lyles, that he had filed a lawsuit against them, yet his claim is that they retaliated against him for filing this lawsuit. (Doc. 29, p. 16)

As to the actions of Warden Headley in response to the plaintiff's request to observe the High Feast of Yule and the High Feast of Ostara, which had been approved by the RARC, the plaintiff has met his burden of establishing that he was engaged in a protected activity. Warden Headley responded to the plaintiff's allegation by saying that "[o]n March 7, 2011, inmate Smith was randomly selected for a Warden to Warden swap that was initiated by WE Donaldson Correctional Facility. Inmate Smith was returned to St. Clair Correctional Facility on March 16, 2011 at the request of WE Donaldson Correctional Facility." (Doc. 51, Headley affidavit p. 2). The plaintiff stated in response to this explanation, however, that a few weeks before he was transferred the classification division had recommended no change in custody or institutional placement and on two occasions his transfers were preceded by his request for a religious exercise. (Doc. 65, exh. A). While it is true that inmates do not have a constitutionally protected liberty interest in avoiding transfer to another prison, "prison officials may not transfer an inmate in retaliation for exercising his right to file [lawsuits] against prison officials." *Id*. *See also Bridges v. Russell*, 757 F.2d 1155 (11th Cir. 1985). The plaintiff argues that the chronology of the events illustrate the defendants were retaliating

against him for the exercise of his First Amendment rights. (Doc. 65, p. 23).

Warden Headley responded to the plaintiff's allegation with an affidavit in which he stated that the plaintiff was randomly selected for a prison swap. Warden Headley's explanation was a "legitimate, non-retaliatory reason" for his actions and was sufficient to shift the burden of persuasion back to the plaintiff. It was then the responsibility of the plaintiff to come forth with facts to show that the explanation offered by Warden Headley was a mere pretext for retaliation. The plaintiff has failed to do so. Additionally, the Warden learned of the lawsuit in August and the plaintiff is complaining that an action taken in March was in retaliation for filing the lawsuit. The plaintiff is asking the court to see a connection between the two. Because the plaintiff has failed to dispute the explanation offered by Warden Headley, the court need not address the question of whether there is in fact a causal link between the filing of the lawsuit and the adverse action taken against the plaintiff.

Inasmuch as the plaintiff has failed to submit specific facts to dispute or bring into question the statements in the defendants' affidavits, the defendants are entitled to summary judgment on plaintiff's claim that they retaliated against him for filing this lawsuit.


## RESPONDEAT SUPERIOR

Plaintiff names Former Governor Bob Riley, Former Commissioner Richard Allen, and Associate Commissioners Terrance McDonnell, James DeLoach, and Grant Culliver as

defendants, but has not alleged that any of them were personally involved in the incidents about which he complains.  Plaintiff simply attempts to implicate these defendants through the concept of *respondeat superior*.  However, "[t]here is no *respondeat superior* liability under § 1983."  *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995) (*citing Monell v. Department of Social Services*, 436 U.S. 658, 690-92 (1978) and *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994)).  "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Florida Dept. of Labor and Employment Security*, 133 F.3d 797, 802 (11th Cir. 1998).  Supervisory personnel may be held accountable for the constitutional violations of their subordinates upon proof that they (1) were directly involved in the wrongdoing; (2) failed to remedy a wrong after learning of it through report or appeal; (3) created or allowed a policy under which the violation occurred; or (4) were grossly negligent in managing the subordinates who caused the wrongdoing. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir. 1986).  Absent some allegation that Former Governor Bob Riley, Former Commissioner Richard Allen, and Associate Commissioners Terrance McDonnell, James DeLoach, and Grant Culliver knew of, sanctioned, participated in or was otherwise "affirmatively link[ed]" to the acts here complained of, the claim against them is insufficient to state a cause of action under 42 U.S.C. § 1983. The plaintiff alleges that, "[o]ver the last several years, Plaintiff has continually notified these individuals of the unconstitutional conditions and practices occurring within the ADOC. They have all been non-responsive and

shown indifference to these matters as set out above." (Doc. 29, p. 28). The Eleventh Circuit has said that the grant of summary judgment is appropriate where an inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants. *Harris v.Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995). The plaintiff's allegation that these defendants are indifferent to the conditions and practices of the ADOC is not supported by any facts. Accordingly, this action is due to be dismissed as to defendants Former Governor Bob Riley, Former Commissioner Richard Allen, and Associate Commissioners Terrance McDonnell, James DeLoach, and Grant Culliver as defendants.

## RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

Accordingly, for the reasons stated above, the magistrate judge RECOMMENDS that the defendants' special report be treated as a motion for summary judgment and, as such, fully granted and that this action de dismissed.

Any party may file specific written objections to this report and recommendation within fifteen (15) days from the date it is filed in the office of the Clerk. Written objections shall specifically identify those portions of the proposed findings and recommendations to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action. Frivolous, conclusive, or general objections will not be considered by the District Court. Failure to file written objections to the proposed findings and recommendations of the magistrate judge's report within fifteen (15) days shall

bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). A copy of the objections must be served upon all other parties to the action. It is not necessary for plaintiff to repeat his legal arguments. As to the facts, if plaintiff does respond, he should limit himself to addressing the statements of fact contained in the report and recommendation to which he objects; the objections is not the place to make new allegations or present additional evidence.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendations to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge. Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a district judge.

DONE this the 7th day of February, 2013.

Robert R. Armstrong, Jr.
United States Magistrate Judge